Mr. Fujiaki, you're on now. Go ahead. Good morning. Is this time to begin my argument? Yes, this is your time. May it please the court, I represent Bradley Pai, who is the appellant in this case. We've outlined three main issues in our brief, and since then I haven't found any new authority which would clarify the issues we raised. Very briefly, on March 30, 2004, Bradley Pai was occupying a shack on property owned by a man named Mr. Wrightall. There was no record of the house being built on the property, no building permit ever issued. But anyway, at the time, the McCanless people, represented by Keith Unger, had filed an action in the court to remove Mr. Pai and his family from that area. They had not yet been served on Mr. Pai, and his arrest provided a good opportunity to make service the next day, and default was conveniently entered while Mr. Pai was in federal custody on this firearms charge. With respect to the illegal search issue, Mr. Pai represented himself until plea and sentencing, and I was his standby counsel, but he sought to suppress the evidence based on an illegal search. There were two basic positions, one being Zimmerman v. Bishop Estate. The search would be permissible because, in that case, the police were properly entered to remove Zimmerman and others from the property. And we had relied on Sandoval 200 F3-659, in which a person was squatting on property and he had his tent all zipped up, and it was improper to go in and search. We believe that Sandoval is more applicable here because, in Zimmerman, I believe it was simply a matter of entering the property to remove the people who were staying where they shouldn't be. In this case, it was not the owner himself, but Unger, who gave consent to search the property, and it was only after these proceedings began that Thomas Rytel ratified Unger's actions by saying he had authority to do what he did. Mr. Pai did take precautions to protect his privacy. He had the house locked up and he did have the gun partially covered, so we would argue that the Sandoval case would be the more appropriate authority to follow. Now, in terms of the witnesses, which I sought to introduce at trial and to eliminate and exclude them, again, I was not counsel of record, I was a stand-by, but I think what Bradley Pai was trying to do there was show that though witnesses against him had motive or bias in terms of their interest in prevailing on the civil case, despite what he felt was his legitimate claim to the property, and if he could show there's some legitimacy to it, he could discredit the witnesses against him and possibly even show that the gun had been planted where it was, because otherwise he does have a felony record and the possession offense is a feral crime. So I think that's what he was trying to do there. We also challenged supervised release because Mr. Pai has a prescription to use medical marijuana. He wanted to do that once he was out of jail, but it would create problems on supervised release. So I think in terms of the necessity of supervised release, for this particular offense with this particular defendant's record, it is a matter of discretion, and the government has raised some compelling arguments in terms of Mr. Pai's record and his adjustment on pre-trial release, but we feel that despite his philosophical idiosyncrasies, given the nature of the offense and the fact that Mr. Pai's criminal history was in the distant past, in fact, the convictions were too old to even count as criminal history points for guideline categorization, he should have been allowed excuse for supervised release, and if he does use medical marijuana, if the federal authorities find it illegal, they certainly have other remedies. They could prosecute him for that if that is what they had in mind. All right, do you want to save some time for rebuttal? Do you want to save some time for rebuttal? Yes, I think we'll still reserve a couple of minutes for the government's rebuttal, so I'll yield to Mr. Porter at this point. All right, fine. Thank you. Good morning. Wes Porter, Assistant United States Attorney representing the District of Hawaii and the United States, the appellant in this matter. I can just go in order through the three issues that are raised in the brief, unless one particular issue the panel has questions about. The first issue, of course, has to do with the motion to suppress brought at the district court level. Now the motion to suppress in this case arose after the defendant essentially on someone else's land, broke into someone else's private residence, took up residence there, lived there for a while, moved his own stuff in. I'm sorry to interrupt. Mr. Porter, could you speak a little louder, please? Sure. Took up residence inside of this private beach house and essentially stored items therein and lived there for an extended period of time. Once confronted by what would be the ranch owners, the ranch owners and the owner of this beach house had sort of an understanding that the ranch managers would check on the beach house and they knew someone was living in there. Properly called the local authorities, the Hawaii County Police Department, and this case ensued. Now the question becomes, once that private beach house that the defendant was squatting in was searched, pursuant to the consent of the owner and the supervision and direction of the ranch manager, they recovered items belonging to the defendant, including the firearm that was subject to this prosecution. So essentially what he does is he then tries to suppress the search. Of course, the standard being whether he has a subjective belief that he has an expectation of privacy and whether that expectation of privacy is one that society is prepared to recognize. Mr. Porter, this is Judge Fletcher speaking. There was an unconditional plea in this case, I believe. Is that correct? He pled straight up to the charge. So has he not waived all motions such as the suppression motion? He has. He has never preserved that. Why don't you just argue that? I believe it was part of our briefing in the beach house. That seems to me the critical point that you have to present. Well, is it part of your briefing? I don't think I found it. Maybe I missed it. And essentially, I mean, that's the issue that one of the things that we talked about is that this was a plea on sort of the 11th hour after the second issue that we're going to get to that has to do with essentially he lists out and there was a confusion all along in this case that there was a parallel civil action having to do with his ejectment from this property. And all along the defendant, while he kind of went back and forth between being pro se and having a standby attorney, as a pro se, he sort of just wanted to call every witness that he could think of that would have to do with some sort of at least personal belief that he had a right to be on this land, not necessarily ever getting to the issue at trial with whether he was in possession of the firearm or maybe even one step further removed that that possession would be established through constructive possession and tying him into... Well, you know, maybe he did have a reasonable expectation of privacy in that shack, as you call it. Reasonable in the sense that society was prepared to recognize it after breaking in? Well, I don't know that he broke in. He was there and attended the graves of his wife's ancestors. I mean, what do you do about a homeless person who's living in a tent somewhere? Do they have a reasonable expectation of privacy in that tent or in that cardboard box? Well, I think that's precisely the issue that was brought up at the district court level. And that's the difference between the Ninth Circuit's two decisions in Sandoval and in Zimmerman. And when you have your, quote unquote, your own residence, whether it's a tent or a cardboard box that you happen to place on someone else's land, I think Sandoval stands for the position that that may be an expectation of privacy that we're prepared to recognize and society is prepared to recognize. It's the flip side in this court's decision in Zimmerman that when you're actually taking up and breaking into and living in someone else's residence now as the burglar, as the criminal in all this, whether that is something that society is prepared to recognize as reasonable is the question. And the district court, I think, properly decided the answer is no. Well, we have him down here as a squatter, right? Yeah, I think a lot of that's terminology. I mean, he broke into the place and then lived there. And maybe he, I mean, maybe he was seeking rights as an adverse possessor. I don't know. I think even that, Your Honor, was. Yeah, I think that being ever so humble in someone's home and maybe there's a lessened expectation of privacy, but I think if there isn't one, there ought to be one. And I think if the panel were to so hold, I think that would be an extension on the law. And I think it would run contrary to the Supreme Court's decision in Rakes when they went through looking at, and we're going to get into that characterization, the distinction, and that is when they looked at a criminal and whether the criminal had a right to, you know, search in a stolen car, they actually used as an example a burglar applying his trade. Isn't it easy to put labels of criminal on people? Well, when someone cuts the lock of a front door of my residence or breaks in through the front door and then takes up living there, I think that person has committed a crime. He's committed a burglary under most state law, and I might be being too broad by calling him a criminal, but he's certainly committed a burglary and continued to live in my residence. How long did he live there? I think it was a matter of weeks. And it really comes down to almost something akin to the Supreme Court's example in Rakes, and that is, you know, it really is, it might have been a burglar applying his trade. Well, was this a conditional plea of guilty or not? No, it was a straight-up plea, not preserved. So then what are you arguing about? I was answering that. I mean, you're the one that didn't even touch on that issue. That's correct. The great pleasure handed it to you. That's correct, Your Honor. I mean, are you awake this morning? I am, I am. I was actually making an effort to move on to what would be the second issue having to do with the witnesses that were not allowed to be called by the district court, and essentially— Well, if it's an unconditional plea, then that ends it. Is this news to you, Counsel? No. We only have these couple issues that we're addressing. Those first two, they were brought up by opposing counsel. I'm showing I'm addressing them. Okay. I don't find in the brief, maybe you can point to it if it's there, that you rely at all on the unconditional plea as waiving any objection to any pretrial rulings, which is what it does, but maybe you waived that issue yourself. Maybe. And the last issue would be the supervised release issue, which is, of course, a sentencing determination that may be brought up, and that has to do with essentially what the defendant has to rely on when it talks about whether the district court can properly impose supervised release. Essentially what they're looking at at that point, they can't challenge the individual condition, that is the mandatory drug testing, the mandatory monitoring, that you cannot use or possess drugs while on supervised release. Instead, what the argument has to be, as couched by the defendant in his brief, the third issue, is the district court erred in imposing supervised release in the first instance. Well, you can't – where does that come from? It seems to me we've had numbers of cases where a particular condition of supervised release is challenged. They can certainly challenge it. I think the problem is under 353D that it's a mandatory condition that once someone's put on it in these circumstances. Okay. This is a mandatory condition. Yes. And so I think that's – the defendant makes his best attempt in his brief to have a workaround, and that is I'm going to challenge the fact that supervised release was imposed and say that the district court erred in imposing it. Well, what does the Supreme Court have to say about medical marijuana? The most recent is Gonzales v. Reich, which essentially said that the Controlled Substances Act is good law, that it's a valid use of the Commerce Clause, and that, of course, it preempts the state laws having to do with medical marijuana, in that case, California's. Well, you know, that was my decision that was reversed by the Supreme Court, and I always like to hear that case cited. That's why I tried not to cite it, Your Honor. Don't worry about sparing my feet. Okay, anything else you want to say? You're way out of your time. No, Your Honor. Okay. All right, Mr. Fujioka, you want to say anything? Mr. Fujioka? Yes. Okay, your rebuttal time is up now. Okay, thank you. I think the bottom line is there are strong arguments on both sides of all these issues. The problem is that the landowners and their agents use the criminal process to circumvent or to short-circuit the civil ejectment process, and the issues go further than whether Mr. Pai is a felony recruit and did he possess a firearm. It goes much deeper than that. It involves his right to be on the land, and whether the witnesses against him did something they should not have in order to gain an advantage over him. With that in mind, we would ask the Court to favorably consider the points raised on appeal. Thank you. Very well. The matter is then submitted. We'll go to the next case.
judges: B. Fletcher, Pregerson, Canby